# Exhibit 1

# DEPARTMENT OF HOMELAND SECURITY (DHS)

# STATEMENT OF WORK (SOW)
# FOR
### *Media Monitoring Services*

## 1.0  GENERAL

### 1.1 BACKGROUND
NPPD's mission is to lead the national effort to protect and enhance the resilience of the nation's physical and cyber infrastructure.  NPPD includes the Office of the Under Secretary (OUS) and five sub-components: the Office of Cybersecurity and Communications (CS&C), the Office of infrastructure Protection (IP), the Federal Protective Service (FPS), the Office of Biometric Identity Management (OBIM) and the Office of Cyber and Infrastructure Analysis (OCIA), which are headquartered with the National Capital Region (NCR).  Along with NPPD/OUS, Public Affairs is responsible for media communication.

### 1.2  SCOPE
The contractor shall provide NPPD/OUS with traditional and social media monitoring and communications solutions.

### 1.3 OBJECTIVE
Services shall enable NPPD/OUS to monitor traditional news sources as well as social media, identify any and all media coverage related to the Department of Homeland Security or a particular event. Services shall provide media comparison tools, design and rebranding tools, communication tools, and the ability to identify top media influencers.

NPPD/OUS has a critical need to incorporate these functions into their programs in order to better reach Federal, state, local, tribal and private partners.

## 2.0  SPECIFIC REQUIREMENTS/TASKS

### 2.1    Tasks One:  Online & Social Media Monitoring

Ability to track global online sources for coverage relevant to Washington and the six media hubs:
- Ability to track > 290,000 global news sources
- Ability to track online, print, broadcast, cable, radio, trade and industry publications, local sources, national/international outlets, traditional news sources, and social media
- Ability to track media coverage in > 100 languages, including Arabic, Chinese and Russian. Translation function to instantly translate these articles to English.
- Ability to create up to 20 searches with each unlimited keywords
- Unlimited coverage per search (no cap on coverage)
- Ability to change the searches at keywords at any given time
- Ability to create unlimited data tracking, statistical breakdown, and graphical analyses on any coverage on an ad-hoc basis

**2.2**   **Task Two: Media Intelligence and Benchmarking Dashboard Platform**

24/7 Access to a password protected, online platform for users to access:
- Overview of search results in terms of online articles and social media conversations
- Customized and Interactive Dashboard that provide real-time monitoring, analysis, and benchmark of media coverage.
- Ability to analyze the media coverage in terms of content, volume, sentiment, geographical spread, top publications, media channels, reach, AVE, top posters, influencers, languages, momentum, circulation.
- Ability to select time-period of analysis: per day, week, month, and selected dates
- Ability to build media lists based on beat, location, outlet type/size, and journalist role
- Automated weekly overview of these dashboards sent via email

**2.3**   **Task Three: Email Alerts**

Daily email alerts with new search results:
- Ability to customize these email alerts per user

**2.4**   **Task Four: Access to Mobile app**

24/7 Access to a password protected, mobile app for users to access:
- Overview of search results in terms of online articles and social media conversations
- Ability to view coverage written in Arabic, Chinese and Russian. Ability to access English translation of this coverage within the mobile app.
- Ability to set up push notifications to be alerted of new search results
- Ability to forward media coverage via email, sms or what's app

**2.5**   **Task Five: Media Engagement**

24/7 Access to a password protected, media influencer database, including journalists, editors, correspondents, social media influencers, bloggers etc.
- Ability to browse the database based on location, beat and type of influencer
- Ability to perform ad-hoc searches on the database based on keywords, concepts, or using Boolean search terms
- Ability to perform searches in other languages including Arabic, Chinese and Russian, in order to find influencers that publish in these languages.
- For each influencer found, present contact details and any other information that could be relevant, including publications this influencer writes for, and an overview of the previous coverage published by the media influencer
- Ability to create unlimited media lists for specific topics
- Ability to export the contact details of the media influencers per media list.
- Ability to send out unlimited press releases via the platform and to monitor the open-rate of the press releases send out.
- Ability to manage contacts

**2.6     Task Six:  Customer Service**

Implementation Support:
- The contractor shall provide access to an implementation consultant who is an experienced trainer and implementer and whose goal is to prepare NPPD/OUS to go live with the solution and provide best practices. The contractor shall work closely with NPPD/OUS project managers throughout the implementation process.
- Ongoing Support: The contractor shall manage technical requests and issues through a ticketing system via phone, email, or online during regular business hours in the U.S Eastern timezone. In addition, 24-hour emergency online support must be available during off-business hours.

## 3.0 OTHER APPLICABLE CONDITIONS

## 3.1 PERIOD OF PERFORMANCE

The period of performance for this contract is base year one (1) 12-month, and four (4) 12-month option periods.  The period of performance will be determined after award

## 3.2     PLACE OF PERFORMANCE

The principal place of work will be at the contractor's facility or its designated alternate work place.

## 3.3 DISCLOSURE OF INFORMATION
Information furnished by the contractor under this contract may be subject to disclosure under The freedom ofinfo1mation act (FOIA). Therefore, all items that are confidential to business, or Contain trade secrets, proprietary, or personally-identifiable information must be clearly marked. Any information made available to the contractor by the government must be used only for the Purpose of carrying out the requirements of this contract and must not be divulged or made !Mown in any manner to any person except as may be necessary in the performance of the Contract.

## 3.4 Advertisements, Publicizing Awards, and News Releases
All press releases or announcements about agency programs, projects, and contract awards need to be cleared by the Program Office and the Contracting Officer. Under no circumstances shall the Contractor, or anyone acting on behalf of the Contractor, refer to the supplies, services, or equipment furnished pursuant to the provisions of this contract in any publicity news release or commercial advertising without first obtaining explicit written consent to do so from the Program Office and the Contracting Officer.

## 3.5  GENERAL REPORT REQUIREMENTS
The Contractor shall provide all written reports in electronic format with read/write capability using applications that are compatible with DHS workstations (Windows XP and Microsoft Office Applications).

## 3.6  SECTION 508 COMPLIANCE

Section 508 of the Rehabilitation Act, as amended by the Workforce Investment Act of 1998 (P.L. 105-220) requires that when Federal agencies develop, procure, maintain, or use electronic and information technology (EIT), they must ensure that it is accessible to people with disabilities. Federal employees and members of the public who have disabilities must have equal access to and use of information and data that is comparable to that enjoyed by non-disabled Federal employees and members of the public.

All EIT deliverables within this work statement shall comply with the applicable technical and functional performance criteria of Section 508 unless exempt. Specifically, the following applicable EIT accessibility standards have been identified:

36 Code of Federal Regulations (CFR) 1194.21 Software Applications and Operating Systems, applies to all EIT software applications and operating systems procured or developed under this work statement including but not limited to GOTS and COTS software. In addition, this standard is to be applied to Web-based applications when needed to fulfill the functional performance criteria. This standard also applies to some Web based applications as described within 36 CFR 1194.22.

36 CFR 1194.22 Web-based Intranet and Internet Information and Applications, applies to all Web-based deliverables, including documentation and reports procured or developed under this work statement. When any Web application uses a dynamic (non-static) interface, embeds custom user control(s), embeds video or multimedia, uses proprietary or technical approaches such as, but not limited to, Flash or Asynchronous JavaScript and XML (AJAX) then 1194.21 Software standards also apply to fulfill functional performance criteria.

36 CFR 1194.41 Information Documentation and Support, applies to all documents, reports, as well as help and support services. To ensure that documents and reports fulfill the required 1194.31 Functional Performance Criteria, they shall comply with the technical standard associated with Web-based Intranet and Internet Information and Applications at a minimum. In addition, any help or support provided in this work statement that offer telephone support, such as, but not limited to, a help desk shall have the ability to transmit and receive messages using TTY.

14.2 Section 508 Applicable Exceptions

Exceptions for this work statement have been determined by DHS and only the exceptions described herein may be applied. Any request for additional exceptions shall be sent to the COR and a determination will be made in accordance with DHS Management Directives (MD) 4010.2. DHS has identified the following exceptions that may apply: 36 CFR 1194.3(b) Incidental to Contract, all EIT that is exclusively owned and used by the contractor to fulfill this work statement does not require compliance with Section 508. This exception does not apply to any EIT deliverable, service or item that will be used by any Federal employee(s) or member(s) of the public. This exception only applies to those contractors assigned to fulfill the obligations of this work statement and for the purposes of this requirement, are not considered members of the public.

14.3 Section 508 Compliance Requirements

36 CFR 1194.2(b) (COTS/GOTS products), When procuring a product, each agency shall procure products which comply with the provisions in this part when such products are available in the commercial marketplace or when such products are developed in response to a

Government solicitation. Agencies cannot claim a product as a whole is not commercially available because no product in the marketplace meets all the standards. If products are commercially available that meets some but not all of the standards, the agency must procure the product that best meets the standards. When applying this standard, all procurements of EIT shall have documentation of market research that identify a list of products or services that first meet the agency business needs, and from that list of products or services, an analysis that the selected product met more of the accessibility requirements than the non-selected products as required by FAR 39.2. Any selection of a product or service that meets less accessibility standards due to a significant difficulty or expense shall only be permitted under an undue burden claim and requires authorization from the DHS Office of Accessible Systems and Technology (OAST) in accordance with DHS MD 4010.2.

All tasks for testing of functional and/or technical requirements must include specific testing for Section 508 compliance, and must use DHS Office of Accessible Systems and Technology approved testing methods and tools. For information about approved testing methods and tools send an email to accessibility@dhs.gov.

**4.0    INVOICES AND PAYMENT PROVISIONS**

Invoices shall be prepared per Section VII, Contract Clauses; Paragraph A. entitled "FAR CLAUSES INCORPORATED BY REFERENCE," FAR Clause 52.232-25 Prompt Payment, and FAR Clause 52.232-7, Payments under Time and Materials and Labor-Hours.  In addition to invoice preparation as required by the FAR, the Contractor's invoice shall include the following information:

1)   Cover sheet identifying DHS;
2)   Task Order Number;
3)   Modification Number, if any;
4)   DUNS Number;
5)   Month services provided
6)   CLIN and Accounting Classifications
7)   ATTN:  NPPD/OUS

B.   The contractor shall submit invoices monthly.
C.   Contract Line Item Number (CLIN) and description for each billed item.
D.   Any additional backup information as required by this contract.
E.   The Contractor shall submit the invoice electronically to the address below:

   E-mail: NPPDInvoice.Consolidation@ice.dhs.gov

F.   Simultaneously provide an electronic copy of the invoice to the following individuals at the addresses below:

 E-mail: <Contract Officer>

   <Contract Specialist>

   Remond Ragin
   Contracting Officer Representative (COR)
   1616 N. Fort Myer Drive
   Arlington, VA 22209
   Phone: 703-235-2164

5

[remond.ragin@hq.dhs.gov](mailto:remond.ragin@hq.dhs.gov)

The contractor shall submit invoices to the email addresses above.  Additionally, the contractor shall prepare and submit a sufficient and procurement regulatory compliant invoice and receiving report for technical certification of inspection/acceptance of services and approval for payment.  The contractor shall attach back up information to the invoices and receiving reports substantiating all costs for services performed.  The receiving agency's written or electronic acceptance by the COR and date of acceptance shall be included as part of the backup documentation.

If the invoice is submitted without all required back up documentation, the invoice shall be rejected.  The Government reserves the right to have all invoices and backup documentation reviewed by the Contracting Officer prior to payment approval.

## 5.0  DELIVERABLES

The Contractor shall consider items in **BOLD** as having <u>mandatory</u> due dates.  Items in *italics* are deliverables or events that must be reviewed and/or approved by the COR prior to proceeding to next deliverable or event in this SOW.

| ITEM | SOW REFERENCE | DELIVERABLE / EVENT | DUE BY | DISTRIBUTION |
|---|---|---|---|---|
| 1 | 2.1 | **Online & Social Media Monitoring** | Within 5 business days of award. | COR |
| 2 | 2.2 | **Media Intelligence and Benchmarking Dashboard Platform** | Within 5 business days of award. | COR |
| 3 | 2.3 | **Email Alerts** | Within 5 business days of award. | COR |
| 4 | 2.4 | **Access to Mobile app** | Within 5 business days of award. | COR |
| 5 | 2.5 | **Media Engagement** | Within 5 business days of award. | COR |
| 6 | 2.6 | **Customer Service** | Within 5 business days of award. | COR |

# Exhibit 2



**epic.org**

Electronic Privacy Information Center
1718 Connecticut Avenue NW, Suite 200
Washington, DC 20009, USA

+1 202 483 1140
+1 202 483 1248
@EPICPrivacy
https://epic.org

VIA EMAIL

April 13, 2018

Toni Fuentes
FOIA Officer
National Protection and Programs Directorate
U.S. Department of Homeland Security
245 Murray Lane SW
STOP-0655
Washington, D.C. 20528
Email: NPPD.FOIA@dhs.gov

Dear Mr. Fuentes:

     This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted on behalf of the Electronic Privacy Information Center ("EPIC") to the Department of Homeland Security ("DHS") National Protection Programs Directorate ("NPPD").

     EPIC seeks the NPPD's Privacy Impact Assessment for "Media Monitoring Services" and related records.[1]

Documents Requested

(1) The required Privacy Impact Assessment conducted the April 3, 2018 solicitation for "Media Monitoring Services;"
(2) Any associated agency records including but not limited to policy guidelines, memoranda, email communications, and Privacy Threshold Analysis related to "Media Monitoring Services;"
(3) All awarded contracts for "Media Monitoring Services."

Background

     On April 3, 2018, the NPPD posted a solicitation seeking a contractor to help monitor news sources from around the world as well as compile a database of journalists and "media influencers."[2] The Draft Statement of Work ("SOW") outlined several requirements that the contractor must provide such as media comparison tools, communication tools, and design and rebranding tools for monitoring and identifying "any and all media coverage related to the [DHS]

---

[1] U.S. Dep't of Homeland Sec., RNBO-18-00041, Media Monitoring Services (Apr. 3, 2018), https://www.fbo.gov/index.php?s=opportunity&mode=form&id=22aa793f75ce05efd160cfa36d7a8acc&tab=core&tabmode=list&=.
[2] *Id.*

or a particular event."³ The NPPD stated that it has a "critical need to incorporate these function into their programs in order to better reach Federal, state, local, triable and private partners."⁴

According to the SOW, the NPPD wishes to track more than 290,000 global news sources through various mediums such as "online, print, broadcast, cable, radio, trade and industry publications, local sources, national/international outlets, traditional news sources, and social media."⁵ The NPPD wants services to track media coverage in over 100 languages including Arabic, Chinese, and Russian and have the ability to instantly translate these articles into English. Additionally, the NPPD wants to have the option to "create unlimited data tracking, statistical breakdown, and graphical analysis on any coverage on an ad-hoc basis."⁶ The scope of the coverage includes a search feature that would create "up to 20 searches with each unlimited keywords" as well as unlimited coverage per search "with no cap on coverage."

The selected contractor shall provide the NPPD with 24-hours a day, seven days a week access to both a "password protected" mobile application and online platform of the compiled media coverage.⁷ The SOW does not include details about whether the selected contractor must provide additional cybersecurity safeguards other than password protection. In both services, mobile and online, the NPPD wants the ability to build media lists based on "beat, location, outlet type/size, and journalist role."⁸ The mobile and online services must include the search results in terms of both online articles and social media conversations.⁹ The SOW does not specify whether personally identifiable social media handles or article attributions would be removed prior to the media coverage being placed on the online and mobile platforms. The online platform service must allow the NPPD to analyze the collected media coverage by a variety of categories including content, volume, geographical spread, top posters, influencers, and even the journalist's sentiment.¹⁰ The ability to not only identify top posters and media influencers but also the ability to build categorical lists that include a journalist's role in a media outlet invariably includes personally identifiable information attributed to an individual.

In addition to data collection services, the NPPD wants a 24-hours a day, seven days a week access to a "password protected" database of media influencers, which includes journalists, bloggers, editors, correspondents, and social media influencers.¹¹ This database would be capable of searching and identifying individual media influencers based on their prior publications, their location, beat, the publications they write for, and relevant contact information.¹² The database would also be capable of keyword searches in both English and foreign languages, including

---

³ U.S. Dep't of Homeland Sec., Draft Statement of Work for Media Monitoring Services 1 (2018), *available at* https://www.fbo.gov/utils/view?id=d9457031df47f06feec110d18dfbc7ef [hereinafter Draft Statement of Work].
⁴ *Id.*
⁵ *Id.*
⁶ *Id.*
⁷ *Id.* at 2
⁸ *Id.*
⁹ *Id.*
¹⁰ *Id.*
¹¹ *Id.*
¹² *Id.*

Arabic, Chinese, and Russian.[13] This database undoubtedly includes personally identifiable information about media influencers.

Responses to the solicitation are due on April 13, 2018.[14]

PIA Requirement

The DHS Privacy Office requires that every technology system complete a Privacy Threshold Analysis ("PTA") as a first step in its Certification & Accreditation process, an internal security and operating compliance process that assures that the information technology systems meet the appropriate standards.[15] If the DHS Privacy Office determines that the DHS program or system has privacy implications, then it will require additional privacy compliance documentation (i.e., a Privacy Impact Assessment).

According to Section 208 of the E-Government Act, an agency is required to undertake a Privacy Impact Assessment ("PIA") when a federal agency "develop[s] or procur[es] information technology that collects, maintains, or disseminates information that is in an identifiable form," and (2) when an agency "initiat[es] a new collection of information" that "includes any information in an identifiable form."[16] This identifiable information, referred to as personally identifiable information ("PII"), is any information in a program or system that allows the identity of an individual to be directly or indirectly inferred.[17] The Office of Management and Budget ("OMB"), for the purposes of the E-Government Act, follows the Clinger-Cohen Act definition of information technology: "any equipment, software or **interconnected system or subsystem** that is used in the automatic acquisition, storage, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information."[18]

The OMB further states: "Agencies should commence a PIA **when they begin to develop** a new or significantly modified IT system or information collection." PIAs at the "IT development stage":

> 1. should address privacy in the documentation related to systems development, including, as warranted and appropriate, statement of need, functional requirements

---

[13] *Id.*
[14] U.S. Dep't of Homeland Sec., Media Monitoring Services, *supra* note 1.
[15] U.S. Dep't of Homeland Sec., Privacy Impact Assessments: The Privacy Office Official Guidance 1 (2010), https://www.dhs.gov/sites/default/files/publications/privacy_pia_guidance_june2010_0.pdf [hereinafter DHS PIA Official Guidance]; *See also* Privacy Compliance: Privacy Threshold Analysis (PTA), Dept. of Homeland Sec. (Mar. 30, 2017), https://www.dhs.gov/compliance.
[16] E-Government Act of 2002, Pub. L. No. 107-347, § 208 (b)(1)(A)(i)-(ii), 116 Stat. 2899 (2002).
[17] DHS PIA Official Guidance, *supra* note 15, at 4.
[18] Clinger-Cohen Act of 1996, 40 U.S.C. § 11101(6) (2011) (emphasis added); *See* Exec. Office of the President, Office of Mgmt and Budget, M-03-22, OMB Guidance for Implementing the Privacy Provisions of the E-Government Act of 2002 (Sept. 26, 2003), https://www.whitehouse.gov/wp-content/uploads/2017/11/203-M-03-22-OMB-Guidance-for-Implementing-the-Privacy-Provisions-of-the-E-Government-Act-of-2002-1.pdf [hereinafter OMB E-Government Act Guidance].

analysis, alternatives analysis, feasibility analysis, benefits/cost analysis, and, especially, initial risk assessment;

2. should address the impact the system will have on an individual's privacy, specifically identifying and evaluating potential threats relating to each of the elements identified in section II.C.1.a.(i)-(vii) above, to the extent these elements are known at the initial stages of development;

3. may need to be updated before deploying the system to consider elements not identified at the concept stage (e.g., retention or disposal of information), to reflect a new information collection, or to address choices made in designing the system or information collection as a result of the analysis.[19]

A database of journalists, the "media influencer database" described in Section 2.5 ("Task Five: Media Engagement") of the SOW, is a system of records containing information retrievable by name. Sections 2.1, 2.2, and 2.4 would trigger Section 208 obligations as the searches, per the terms of the system description, could include personally identifiable information such as authorship attribution and social media handles.[20] Additionally, the platform will allow agency officials to search lists and analyze the coverage based on "top posters/influencers."[21]

The "developing or procuring" of a "Media Monitoring System"—which is an informational technology system that will collect and maintain PII— triggers the PIA requirement. The DHS has already "beg[u]n to develop" that system, which means the PIA should already be completed.[22]

Request for Expedition

EPIC is entitled to expedited processing of this request under the FOIA and the DHS's FOIA regulations. 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R. § 5.5(e)(1)(ii). Specifically, this request is entitled to expedited processing because, first, there is an "urgency to inform the public about an actual or alleged federal government activity," and, second, because the request is "made by a person who is primarily engaged in disseminating information." § 5.5(e)(1)(ii).

First, there is an "urgency to inform the public about an actual or alleged federal government activity." § 5.5(e)(1)(ii). The "actual…federal government activity" at issue is

---

[19] OMB E-Government Act Guidance, *supra* note 18, at 5–6 (emphasis added).
[20] Draft Statement of Work, supra note #, at 1–2 (describing the ability to "create unlimited data tracking. . . on any coverage," the ability to "analyze media coverage in terms of . . . top posters, [and] influencers," and the ability to "build media lists based on . . . journalist role").
[21] *Id.*
[22] OMB E-Government Act Guidance, *supra* note 18, at 5–6 (stating that agencies should commence a PIA "when they begin to develop a new . . . IT system or information collection" and the PIA "may need to be updated before deploying the system").

DHS's solicitation of a contractor to help the agency monitor social media and news sources as well as identify and compile a database of "media influencers."

"Urgency" to inform the public about this activity is clear given that the response to the solicitation are due on April 13, 2018. This solicitation comes at the heels of heightened concern about the spread of misinformation through the media and the possibility of foreign influence in U.S. democratic institutions through "fake news." In its 2017 Freedom of the Press Report, watchdog organization Freedom House reports that global media freedom reached its lowest level in 13 years in 2016 with unprecedented threats to journalism, in part by President Trump's disparagement of the credibility of the press.[23] Recently, nineteen members of Congress sent a letter to Attorney General Jeff Sessions to request Qatar-based news channel Al Jazeera to register as a "foreign agents" under the Foreign Agents Registration Act.[24] Led by Reps. Josh Gottheimer (D-N.J.) and Lee Zeldin (R-N.Y.), the letter states "We find it troubling that the content produced by this network often directly undermines American interests with favorable coverage of the U.S. State Department-designated Foreign Terrorist Organizations, including Hamas, Hezbollah, Palestinian Islamic Jihad, and Jabhat al-Nusra, al-Qaeda's branch in Syria." The efforts by lawmakers and the Trump administration to undermine press freedom in that past creates an urgency for the public to know to what extent are NPPD's efforts to create a database that not only identifies journalists but tracks the "sentiments" of thousands of press outlets and analyzes media coverage based on top posters and influencers.

Second, EPIC is an organization "primarily engaged in disseminating information." 6 C.F.R. § 5.5(e)(1)(ii). As the Court explained in *EPIC v. DOD,* "EPIC satisfies the definition of 'representative of the news media'" entitling it to preferred fee status under FOIA. 241 F. Supp. 2d 5, 15 (D.D.C. 2003).

In submitting this request for expedited processing, I certify that this explanation is true and correct to the best of my knowledge and belief. 6 C.F.R. § 5.5(e)(3); 5 U.S.C. § 552(a)(6)(E)(vi).

Request for "News Media" Fee Status and Fee Waiver

EPIC is a "representative of the news media" for fee classification purposes. *EPIC v. DOD*, 241 F. Supp. 2d 5 (D.D.C. 2003). Based on EPIC's status as a "news media" requester, EPIC is entitled to receive the requested record with only duplication fees assessed. 5 U.S.C. § 552(a)(4)(A)(ii)(II).

Further, any duplication fees should also be waived because (i) "disclosure of the requested information is in the public interest because it is likely to contribute to the public understanding of the operations or activities of the government" and (ii) "disclosure of the

---

[23] Jennifer Dunham, Freedom House, Press Freedom's Dark Horizon 3 (2017), https://freedomhouse.org/sites/default/files/FOTP_2017_booklet_FINAL_April28.pdf.

[24] Letter from Josh Gottheimer, Rep. N.J. 5th Dist., et al, to Hon. Jeff Sessions, Attorney Gen., U.S. Dep't of Justice (Mar. 6, 2018), https://gottheimer.house.gov/uploadedfiles/3.6_gottheimer_zeldin_cruz_letter_to_doj_final_signed_copy.pdf.

information is not primarily in the commercial interest" of EPIC, the requester. 6 C.F.R. § 5.11(k)(1); 5 U.S.C. § 552(a)(4)(A)(iii). EPIC's request satisfies this standard based on the DHS's considerations for granting a fee waiver. 6 C.F.R. §§ 5.11(k)(2–3).

> *(1) Disclosure of the requested information is likely to contribute to the public understanding of the operations or activities of the government.*

First, disclosure of the requested documents is "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government." 6 C.F.R. § 5.11(k)(2). DHS components evaluate these four factors to determine whether this requirement is met: (i) the "subject of the request must concern identifiable operations or activities of the federal government, with a connection that is direct and clear, not remote or attenuated"; (ii) disclosure "must be meaningfully informative about government operations or activities in order to be 'likely to contribute' to an increased public understanding of those operations or activities"; (iii) "disclosure must contribute to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to the individual understanding of the requester," and (iv) "[t]he public's understanding of the subject in question must be enhanced by the disclosure to a significant extent." *Id*.

On the first factor, the subject of the request self-evidently concerns "identifiable operations or activities of the federal government" because the NPPDS posted the solicitation for "Media Monitoring Services" and has a critical need to incorporate these services into its programs. 6 C.F.R. § 5.11(k)(2)(i).

On the second factor, disclosure would also be "meaningfully informative about" these operations or activities and is thus "'likely to contribute' to an increased understanding of government operations or activities" because there is little information available about the extent of the monitoring services and media influencer database. While the SOW describes the types of services solicited, it does not address any privacy assessments or safeguards that is required by law when an agency is procuring new technology that collects personally identifiable information. 6 C.F.R. § 5.11(k)(2)(ii).

On the third factor, disclosure will "contribute to the understanding of a reasonably broad audience of persons interested in the subject" because, as provided in the DHS FOIA regulations, DHS components will "presum[e] that a representative of the news media will satisfy this consideration." 6 C.F.R. § 5.11(k)(2)(iii).

Finally, on the fourth factor, the public's understanding will "be enhanced by the disclosure to a significant extent" because the solicitation was issued by a DHS component office that is actively engaged in protecting the nation's physical and cyber infrastructure. Little information is publicly known about the extent and purpose of this database other than what has been described in the SOW. Various news outlets and organizations have expressed concerns that the creation of this database and the extent of the monitoring may have a chilling effect on press freedom.[25] DHS Press Secretary Tyler Houlton tweeted that "the request is nothing more

---

[25] *See e.g.*, Michelle Fabio, *Department of Homeland Security Compiling Database of Journalists and 'Media Influencers'*, Forbes (Apr. 6, 2018),

than the standard practice of monitoring current events in the media. Any suggestion otherwise is fit for tin foil had wearing, black helicopter conspiracy theorists."[26] Regardless of whether this is standard practice, the public has a right to know whether the NPPD has conducted a PIA or considered the privacy implications before collecting potentially large amounts of data on a targeted group of people containing personally identifiable information.

> *(2) Disclosure of the information is not primarily in the commercial interest of the requester*

Second, "[d]isclosure of the information is not primarily in the commercial interest" of EPIC. § 5.11(k)(3). In determining whether this second requirement is met, the DHS components evaluate the following two factors: (i) whether there is "any commercial interest of the requester . . . that would be furthered by the requested disclosure"; and/or (ii) whether "the public interest is greater than any identified commercial interest in disclosure," and "[c]omponents ordinarily shall presume that where a news media requester has satisfied the public interest standard, the public interest will be the interest primarily served by disclosure to that requester." *Id*.

On the first factor, there is not "any commercial interest of the requester . . . that would be furthered by the requested disclosure." 6 C.F.R. § 5.11(k)(3)(i). EPIC has no commercial interest in the requested records. EPIC is a registered non-profit organization committed to privacy, open government, and civil liberties.[27]

On the second factor, "the public interest is greater than any identified commercial interest in disclosure." 6 C.F.R. § 5.11(k)(3)(ii). Again, EPIC has no commercial interest in the requested records and has established that there is significant public interest in the requested records. Moreover, the DHS should presume that EPIC has satisfied 6 C.F.R. § 5.11(k)(3)(ii). The DHS FOIA regulations state "[c]omponents ordinarily shall presume that where a news media requester has satisfied the public interest standard, the public interest will be the interest primarily served by disclosure to that requester." *Id*. EPIC is a news media requester and, as set out above, this request satisfies the public interest standard.

For these reasons, a full fee waiver should be granted for EPIC's request.

---

https://www.forbes.com/sites/michellefabio/2018/04/06/department-of-homeland-security-compiling-database-of-journalists-and-media-influencers/; Cary O'Reilly, *Homeland Security to Compile Database of Journalists, Bloggers*, Bloomberg Big Law Business (Apr. 5, 2018), https://biglawbusiness.com/homeland-security-to-compile-database-of-journalists-bloggers/; Press Release, PEN America, Department of Homeland Security's Plants for Journalists Database Must Be Quashed Immediately (Apr. 8, 2018), https://pen.org/press-release/dhs-journalist-database-must-be-quashed/.

[26] Tyler Q. Houlton (@SpoxDHS), Twitter (Apr. 6, 2018), https://twitter.com/SpoxDHS/status/982372727309963264

[27] *About EPIC*, EPIC.org, http://epic.org/epic/about.html.

## Conclusion

      Thank you for your consideration of this request. I anticipate your determination on our request within ten calendar days. 5 U.S.C. § 552(a)(6)(E)(ii)(I). For questions regarding this request I can be contacted at 202-483-1140 x104 or Zhou@epic.org, cc: FOIA@epic.org.

      Respectfully submitted,

      */s Enid Zhou*
      Enid Zhou
      EPIC Open Government Fellow

      */s John Davisson*
      John Davisson
      EPIC Counsel

# Exhibit 3

**From:** NPPD.FOIA@hq.dhs.gov 🚩
**Subject:** NPPD FOIA Acknowledgment Email 2018-NPFO-00373
**Date:** April 13, 2018 at 2:14 PM
**To:** Zhou@epic.org



April 13, 2018

**SENT VIA EMAIL TO: Zhou@epic.org**

Enid Zhou
Electronic Privacy Information Center (EPIC)
1718 Connecticut Ave
Suite 200
Washington, DC 20009

**RE:   NPPD Case Number 2018-NPFO-00373**

Dear Ms. Zhou:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to U.S. Department of Homeland Security (DHS), National Protection and Programs Directorate (NPPD) dated April 13, 2018, and to your request for expedited treatment and a waiver of all assessable FOIA fees. Your request was received in this office on April 13, 2018. Specifically, you requested the required Privacy Impact Assessment conducted for the April 3, 2018 solicitation for "Media Monitoring Services"; any associated agency records including but not limited to policy guidelines, memoranda, email communications, and Privacy Threshold Analysis related to "Media Monitoring Services"; all awarded contracts for "Media Monitoring Services".

Your request for expedited treatment is hereby granted.

As it pertains to your request for a fee waiver, NPPD evaluates fee waiver requests under the legal standard set forth above and the fee waiver policy guidance issued by the Department of Justice on April 2, 1987, as incorporated into the Department of Homeland Security's Freedom of Information Act regulations.  These regulations set forth six factors to examine in determining whether the applicable legal standard for fee waiver has been met.  I have considered the following factors in my evaluation of your request for a fee waiver:

(1) Whether the subject of the requested records concerns "the operations or activities of the government";

(2) Whether the disclosure is "likely to contribute" to an understanding of government operations or activities;

(3) Whether disclosure of the requested information will contribute to the understanding of the public at large, as opposed to the individual understanding of the requestor or a narrow segment of interested persons;

(4) Whether the contribution to public understanding of government operations or activities will be "significant";

(5) Whether the requester has a commercial interest that would be furthered by the requested disclosure; and

(6) Whether the magnitude of any identified commercial interest to the requestor is sufficiently large in comparison with the public interest in disclosure, that disclosure is primarily in the commercial interest of the requestor.

Upon review of your request and a careful consideration of the factors listed above, I have determined to grant your request for a fee waiver.

NPPD has queried the appropriate program offices within NPPD for responsive records. If any responsive records are located, they will be reviewed for determination of releasability. Please be assured that one of the processors in our office will respond to your request as expeditiously as possible. We appreciate your patience as we proceed with your request.

If you have any questions or wish to discuss reformulation or an alternative time frame for the processing of your request, please contact FOIA office.   You may send an e-mail to NPPD.FOIA@HQ.DHS.GOV, call free 703-235-2211, or you may contact our FOIA Public Liaison in the same manner.  Additionally, you have a right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation.  If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.  You may contact OGIS as follows:  Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Your request has been assigned reference number **2018-NPFO-00373**. Please refer to this identifier in any future correspondence. To check the status of an NPPD FOIA/PA request, please visit http://www.dhs.gov/foia-status. Please note that to check the status of a request, you must enter the 2018-NPFO-XXXXX tracking number.

Sincerely,

NPPD FOIA